UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TALLY COLOMBE, ELNITA RANK,<br>KRISTAL HAWK, RONDA HAWK, and<br>TIFFANY MONTEAU,<br><br>Defendants. | 3:18-CR-30013-01-02-03-04-05-RAL<br><br><br>OPINION AND ORDER DENYING<br>RULE 29 MOTIONS |

The United States in this case indicted six Defendants—Tally Colombe (Colombe), Elnita Rank (Rank), Kristal Hawk (Kristal), Ronda Hawk (Ronda), Tiffany Monteau (Tiffany), and Stefen Monteau (Stefen)—on a single count of conspiracy to retaliate against a witness. Doc. 1. All Defendants pleaded not guilty. This Court conducted a jury trial beginning October 30 and concluding on November 2, 2018. At the close of the Government's evidence, all Defendants made Rule 29 motions for judgment of acquittal, which this Court denied. At the close of all of the evidence, each Defendant renewed their Rule 29 motions for judgment of acquittal, at which time the Court expressed skepticism of whether the Government's evidence was sufficient for a reasonable jury to find each Defendant guilty and signaled that at least with regard to Stefen a Rule 29 motion likely would be granted. This Court chose to reserve decision under Rule 29(b) on all of the motions for judgment of acquittal made at the close of the evidence. The jury found Stefen

not guilty, but found the remaining five Defendants guilty of conspiracy to retaliate against a witness. This Court explains in this opinion and order why it now denies the Rule 29 motions.

## I.  Standard for post-conviction ruling on Rule 29 motion

Rule 29 of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Rule 29(b) permits the court to reserve decision on the motion, submit the case to the jury, and decide the motion after the jury returns a verdict of guilty. Fed. R. Crim. P. 29(b). "If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." Id. This Court reserved its ruling at the close of all of the evidence.

Judgment of acquittal is appropriate "only when no reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Hardin, 889 F.3d 945, 949 (8th Cir. 2018) (citation omitted). When considering a motion for judgment of acquittal, a district court must view the evidence in the light most favorable to the government, must resolve factual conflicts in the government's favor, and must accept all reasonable inferences that support the verdict. United States v. Benton, 890 F.3d 697, 708 (8th Cir. 2018). A court on a Rule 29 motion "is not to weigh the evidence or assess the credibility of witnesses." United States v. Bredell, 884 F.2d 1081, 1082 (8th Cir. 1989) (citing Burks v. United States, 437 U.S. 1, 16 (1978)). "A motion for judgment of acquittal should be granted only if there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." United States v. Dupont, 672 F.3d 580, 582 (8th Cir. 2012) (per curiam) (citation omitted); see United States v. Hood, 51 F.3d 128, 129 (8th Cir. 1995) ("Jury verdicts are not lightly overturned.").

## II.  Facts established at jury trial

The indictment of these six Defendants for conspiracy to retaliate against a witness has its roots in an earlier criminal case in this Court captioned <u>United States v. Tally Colombe</u>, 16-CR-30126. In that earlier case, Colombe pleaded guilty to wire fraud and program fraud arising out of embezzlement and misuse of funds of a not-for-profit entity called Hunkpati Investments. Colombe had been the executive director of Hunkpati Investments. Hunkpati Investments was a community development financial institution (CDFI) that relied upon federal funding and other grants to stimulate economic activity on the Crow Creek Indian Reservation in central South Dakota. A CDFI, such as Hunkpati Investments, makes small loans to people who struggle with creditworthiness, provides information and instruction on financial literacy and responsibility, provides loans for debt consolidation, has programs to encourage savings, and engages in other activity designed to improve conditions on the reservation such as running a community garden. Colombe was indicted in December of 2016 for wire fraud, program fraud, forgery, and larceny from Hunkpati Investments; was on pretrial release; pleaded guilty to wire fraud and program fraud on June 27, 2017; resigned as executive director of Hunkpati Investments at that time; and self-reported to the Hughes County Jail consistent with this Court's order on September 1, 2017.

Colombe's embezzlement from Hunkpati Investments left Hunkpati Investments in jeopardy of losing federal funding and grants. Lahoma Simmons (Simmons) had been working as an independent consultant to Hunkpati Investments in 2015 and 2016 to assist in grant reporting, traveling from her home in Oklahoma to Hunkpati Investments' location in Fort Thompson, South Dakota three or four times per year. Around the time of Colombe's guilty plea, the Hunkpati Investments' board of directors hired Simmons to become the interim executive director, and Simmons entered into a three-month contract covering July, August, and September of 2017 to do so. Exh. 11. Hunkpati Investments, perhaps acting through Simmons herself, paid Simmons in

advance for the three months. Exhs. 13, 14. Simmons continued to live in Oklahoma and traveled periodically to South Dakota to work at the Hunkpati Investments site. In or around August of 2017, Simmons discovered what she believed to be evidence of Colombe's ongoing misappropriation of Hunkpati Investments' funds occurring after Colombe had been indicted. Simmons notified the United States attorney handling Colombe's case and provided information and documents to the United States attorney's investigator regarding some of Colombe's post-indictment handling of Hunkpati Investments' monies.

Colombe's sentencing hearing was scheduled for and took place on September 19, 2017. On September 6, 2017, the United States attorney served a subpoena on Simmons to testify at Colombe's sentencing hearing. Simmons informed the board of directors of Hunkpati Investments that she had been served with a subpoena and would be testifying at Colombe's sentencing hearing. Simmons—who previously had a very good relationship with Colombe and had heard from Colombe that she was wrongfully accused of crimes—had come to believe after Colombe's guilty plea that Colombe had crippled Hunkpati Investments financially. Simmons is not a member of the Crow Creek Sioux Tribe and did not have close relations with individuals on the reservation. Simmons advised the Hunkpati Investments' board and the board of the Crow Creek Sioux Tribe housing authority, a business partner of Hunkpati Investments, that Colombe had been convicted of embezzlement crimes and had inflicted severe financial damage on Hunkpati Investments.

After her self-report on September 1, 2017, pending sentencing, Colombe remained incarcerated at the Hughes County Jail. The Hughes County Jail has a policy handbook given to inmates upon their admission that, among other things, alerts inmates that telephone conversations from the Hughes County Jail can be recorded. Exhs. 1, 2. The Hughes County Jail, through a company that supplies calling services, has software that records all calls.

Colombe made a number of calls from and recorded by the Hughes County Jail, three of which were received in evidence at trial. Two of those phone calls occurred on September 8, 2017, which was two days after Simmons was served with the subpoena to testify at Colombe's sentencing hearing. Colombe placed both of the September 8, 2017 calls to her twin sister Tiffany. Colombe and Tiffany are very close, and Tiffany at trial spoke of having a special bond with her twin sister. In September of 2017, Tiffany was living in Chamberlain, which is 26 miles from Fort Thompson and not on the Crow Creek Indian Reservation. Tiffany at the time was working two jobs in Chamberlain—one as the manager and main cashier of Cruzer's Pit Stop and the other as an employee of Upper Crust Pizza. Tiffany was a single mother caring for her three children, including one with a seizure disorder, and had just received temporary custody of Colombe's three children. The phone conversations reveal that Tiffany was behind on her rent, had a wage claim from a previous employer for unpaid monies, and was seeking to sell a vehicle at the time to pay rent. Tiffany's background—including a Bachelor of Science in elementary education from the University of Montana and an associate's degree in nursing, with an employment history of working as the dean of students at a tribal school and as a nurse and treatment counselor previously—contrasted with her tone on the phone which seemed flighty, scattered, and stressed.

The first call between Colombe and Tiffany on September 8, 2017, made clear that Colombe knew that Simmons had provided the United States Attorney's Office with additional information being used to seek an enhanced sentence on Colombe as a result. Exh. 3. Colombe told Tiffany "that the new ED [executive director] Lahoma [Simmons] and Elaine [another Hunkpati Investments employee] are sending the Feds all kinds of stuff about me" and that "the new ED and Elaine are putting the boots to me." Exh. 3. Colombe then told Tiffany "you need to call Stef or grandma and go tell them to lock up that building and don't let them have access to

anything" to which Tiffany responded "okay." Colombe later in the conversation asked Tiffany to call Durine Chase (Chase), who was a former Hunkpati Investments employee that just recently had her employment terminated, to which Tiffany responded "okay I'll call her." Exh. 3.

The "grandma" referred to by Colombe is Defendant Elnita Rank. Rank, in September of 2017, was 80 years old and was the owner of the Mel and Elnita Rank Community Center in Fort Thompson. Hunkpati Investments leased a portion of the Mel and Elnita Rank Community Center for its offices and used other portions of the building at other times, including when presenting seminars. Although there previously had been at least one other tenant in the building, by 2017 the only tenant in the building was Hunkpati Investments.

Colombe called Tiffany a second time on September 8, 2017, about one hour after the first call. Exh. 4. During the second call, Tiffany reported calling Chase and that Ronda—one of the Defendants in this case, an aunt to Tiffany and Colombe and the daughter of Rank—was "beeping in on the other line." Exh. 3. Tiffany told Colombe "grandma sent Ronda down to . . . kick Lahoma [Simmons] and Elaine out of there; it says it's closed on there . . . and Ronda went on a rampage after Lahoma and Elaine." Exh. 3. In fact, Simmons was not in Fort Thompson or at Hunkpati Investments on September 8, 2017. Tiffany then told Colombe "grandma is kicking them out of that building; grandma is pissed." After Colombe asked whether it was "because of me" Tiffany responded "no, because of Lahoma and Elaine, whatever they did, sent you to the Feds, and what or whatever, so grandma said they should leave her alone now. She's got kids to think about." Exh. 3. At trial, Tiffany testified that she called Chase, but it was a different aunt and not Ronda who was beeping in on the phone. Tiffany testified that she had not talked to any of the Defendants between the two calls with Colombe but had received information second and

thirdhand, in part from people who would stop at Cruzer's Pit Stop, a convenience store where she was working on the day of September 8 while having phone conversations with Colombe.

At any rate, later during the second September 8 phone conversation, Tiffany told Colombe that she "called grandma right after I got off the phone with you." However, Tiffany then gave a muddled response to Colombe's question about what grandma said, which could be interpreted as saying she did not call Rank, and concluded with "I don't know who got ahold of grandma." Exh. 3. Tiffany reported that grandma had sent Ronda to the business on September 8. Repeatedly during her trial testimony Tiffany stated that she did not call Rank and was not talking with her grandmother at the time. Tiffany repeatedly testified that she did not relay Colombe's request to remove Simmons from the building and lock her out to anyone at any time. Rather, according to Tiffany, Colombe had been suicidal prior to self-reporting to prison, was distraught for various reasons including the Government seeking an enhanced sentence and Colombe's husband beginning divorce proceedings (both of which are mentioned in the phone conversations), and that Tiffany, as a part of past suicide prevention training, was simply trying to reassure Colombe.

On September 12, 2017, Simmons went to the Hunkpati Investments' office within the Mel and Elnita Rank Community Center. Joining Simmons that day was Florence Ludka (Ludka), a CDFI support forensic accountant from Colorado. Ludka was working for the Northwest Area Foundation, a funding source of Hunkpati Investments, and was tasked with recreating Hunkpati Investments' financial statements. Simmons had wanted help rebuilding financial statements to provide to the United States Department of Agriculture and other funding providers of Hunkpati Investments because Simmons believed the existing financial statements to be inaccurate and unreliable. Simmons had traveled from Oklahoma to the Fort Thompson area on September 11 with her mother Jackie Davidson (Jackie), her father Jerry Davidson (Jerry), and Simmons's five-

year-old son. On September 12, Jackie was in the Hunkpati Investments' office assisting Simmons and Ludka in sorting disorganized stacks of paper from Colombe's former office into stacks by month as a step toward rebuilding financial statements. Jerry was caring for Simmons's son elsewhere.

During the morning of September 12, 2018, Defendant Ronda Hawk came into the Hunkpati Investments' office by herself with a folder containing certain utility bills from Central Electric Cooperative. Ronda may have handed the folder to Elaine Kennedy, a Hunkpati Investments' employee also present that morning, but regardless the folder was then handed to Simmons. Ronda told Simmons that Hunkpati Investments owed utility bills and demanded payment that day. Simmons responded that Hunkpati Investments was unable to pay because it had only $35 in its bank account. Ronda then left the Hunkpati Investments' office.

The electric bills for the Mel and Elnita Rank Community Center were conjoined with bills for two other locations. Exhs. C, D. The electric bills from Central Electric Cooperative for 2017 just for the Mel and Elnita Rank Community Center totaled $1,637.77. An old lease between Diamond Willow Ministries (a prior tenant of the Mel and Elnita Rank Community Center) and Hunkpati Investments called for Hunkpati Investments to pay monthly rent of $750, stated that Diamond Willow Ministries would be responsible for utility payments, required a 30-day written notice for any changes or termination of the rental agreement, and contemplated 24-hours advance notice for Diamond Willow Ministries to enter the Hunkpati Investments office space. Exh. 15. There was no written lease agreement between the actual owner Rank and Hunkpati Investments. Once Diamond Willow Ministries vacated the building, Hunkpati Investments continued to pay monthly rent of $750 to Rank. The Crow Creek Sioux Tribe does not have any tribal law concerning oral leases or eviction procedure. Hunkpati Investments had paid the $750 per month

8

for rent to Rank to cover the time period through the end of September of 2017. Simmons, in August of 2017, had sent an email to board members proposing that Hunkpati Investments find a different office location. Rank had attended a Hunkpati Investments' board of directors meeting in February of 2017 to request that Hunkpati Investments pay the electric bill for the entire Mel and Elnita Rank Community Center in addition to rent. The Hunkpati Investments' board of directors approved of paying Rank for the electric bill as it was the only tenant of the building at that time. Hunkpati Investments had not paid the electric bill at any point in 2017; however, there was no evidence that Rank had attempted to collect for the electric bill prior to September 12, 2017. Durine Chase (Chase) testified that Simmons was aware at least by September 5, 2017, of Hunkpati Investments' responsibility to pay the electric bills and perhaps had received the electric bills from Chase through Elaine Kennedy.

Perhaps two hours after Ronda dropped off the folder containing the electric bills and demanded payment on September 12, Ronda returned with Defendant Kristal Hawk (another aunt to Colombe and Tiffany and the daughter of Rank). Ronda and Kristal took Simmons into an office. Kristal closed and locked the door and stood by it while demanding immediate payment for the utility bill. Simmons, who testified to feeling intimidated and threatened, responded that Colombe stole Hunkpata Investments' money so Hunkpata Investments could not pay the bill. Simmons got to the door and left the office, and Ronda and Kristal then left the building.

A short time later, around 3:00 p.m. on September 12, 2017, Kristal returned to the Hunkpata Investments' office with Rank and Stefen. At the time this occurred, Simmons was with Ludka and her mother Jackie in the Hunkpata Investments' office. Part of this encounter was videotaped by Jackie on her cellphone, although the majority of this encounter was not videotaped. Simmons, Jackie, Ludka and Stefen testified to what occurred during this encounter.

Ludka probably is the most independent witness. Ludka described that vehicles arrived quickly into the parking lot, that she felt startled and scared, and that Kristal and Rank were kicking them all out of the building because of the unpaid electric bill. Ludka went outside to her car but then realized she had left her personal items inside. Ludka went back inside the office to get her personal belongings but then was prevented from leaving by Kristal. Kristal grabbed Ludka's arm, asked for cash from her for the utility bill, and squeezed Ludka's arm so tightly that she left bruises which were later photographed. Exhs. 19–24. Ludka remembers Rank saying "pay the money or get out." Ludka heard Rank say "this is what you get for what you are doing to Tally [Colombe]." Ludka called the police at least three times and called her boss after going back out of the building. Ludka felt that her car was blocked in by a vehicle later identified as Kristal's. Ludka testified that she was already back out in her car when Jackie was taking the video. Ludka identified Defendant Stefen Monteau as having gone in and out, standing at one point in a position where he was blocking the doorway, saying nothing and having no physical contact with anyone. Stefen is a great grandson of Rank and is a large young man.

Simmons testified that Kristal was the most aggressive one and made comments that "this is what you get for testifying against Tally [Colombe]." Simmons recalled that both Rank and Kristal made comments about this being "karma" and indeed the video captures Kristal saying something about "karma" although not mentioning Colombe by name. Exh. 16. During the encounter, Rank wanted payment of the utility bill and said "if you can't pay the bill, you and others would have to leave." Simmons testified that Rank, who was wheelchair bound at age 80 with Parkinson's disease, was maneuvering her wheelchair to block the hallway. Simmons reported that Rank said "if you are going to testify, this is what you get" and that it "won't do you any good to call police as I control them." Neither of those comments are captured on the video,

but the video recorded only the end of the confrontation. Simmons testified, and the video confirms, that she would not leave without getting her personal belongings, which included a purse, a backpack, a personal computer, and some paperwork. Rank directed Stefen to retrieve the purse and then the backpack, and Stefen did so, as shown on the video. Simmons insisted on but did not receive her personal computer or paperwork before leaving.

Jackie testified that the group had confronted Simmons to pay money for a utility bill, that the discussion was over the utility bill and was of an angry and demanding nature, and that she was afraid for her daughter. Jackie called the police several times and called her husband Jerry, who suggested that she make a video on her phone. Jackie then got her purse and took out her phone to create a video of the confrontation. Exh. 16. Jackie remembered no mention of Colombe by the individuals who were confronting Simmons on September 12.

The video shows Rank in a wheelchair in a hallway speaking with Simmons and begins with Simmons demanding her personal property be given to her. Exh. 16. Rank directs Stefen to retrieve Simmons's purse, directs Stefen to leave the computer, and requests that everything be unplugged and shut down. After Simmons insists that the silver computer is hers, Rank asks if her name is on it, and Simmons responds that it is on the login screen. Rank says that Simmons can get it later. Simmons protests and Rank says to lock Simmons up. As the two continue to banter, Rank says to call the police and Simmons responds that she will. Once Simmons has her purse and backpack, Rank raises her voice to say "get out of here before you get me mad." Before that point, Simmons's tone actually was louder than that of Rank. Kristal is heard saying to take up the issue of the computer with the cops and something about "karma comes back around" to which Simmons responds "yep it does." The video ends at that point as Simmons and Jackie leave the building.

Stefen testified that in September of 2017 he worked as a houseparent at the St. Joseph Indian School in Chamberlain, where he is required to reside in the dormitory to supervise groups of students who are staying there as a part of the residential nature of the school. Stefen had gotten off duty on September 11, had not been in contact with Colombe or Tiffany and had agreed, as he commonly did, to drive his then 80-year-old great grandmother Rank on September 12 into town to run errands. Stefen had picked up Rank in the late morning at her home near Fort Thompson. They had had lunch together in Chamberlain and Rank then grocery shopped and paid some bills in Chamberlain. Rank requested to be taken to the Mel and Elnita Rank Community Center building for a meeting. Upon arriving at the building around 3:00 p.m., Stefen observed three cars in the lot, recognizing a black Durango belonging to Ronda and an orange car belonging to Kristal. Stefen thought his great aunts Ronda and Kristal were there to shampoo the carpet. Also in the car with Rank and Stefen was a person Stefen identified as "Uncle Larry" who stayed in the car. Stefen went into the building as another woman was leaving because Kristal requested that he come inside. Stefen then recalled Rank asking him to get some belongings that belonged to Simmons, including a purse and backpack, but did not see a laptop. Stefen overheard conversation about a utility bill, and heard Simmons say that Colombe had stolen money so Hunkpati Investments was broke. Stefen also heard Simmons say she was not leaving the property. Stefen was unaware of any other reasons why anyone was there. Stefen himself called the police and told them of the ongoing dispute. Stefen saw no physical altercation. Stefen is recorded on the video as simply saying "yes?" when Rank calls his name and then retrieving some of Simmons's personal items at Rank's direction. Stefen did not hear anyone say "this is what you get for testifying." Stefen had never met Simmons before.

Jerry Davidson, the father of Simmons and spouse of Jackie, had been out driving in the Lower Brule area with his grandson, the son of Simmons. Upon receiving a call from his wife Jackie that sounded panicked, Jerry told her to take a video on her phone and began driving back to Fort Thompson. When he arrived, he saw a big young man (Stefen) by the front door and observed that people would not let Simmons back into the building. A photograph exists of what Jerry saw. Exh. 18. When things calmed down, everyone got into vehicles. The police then arrived and Jerry, his wife, daughter and grandson went to the police department, where the police, according to Jerry, were unhelpful and simply provided a form to fill out a complaint.

Officer Scott Shields was the police officer who responded to the Mel and Elnita Rank Community Center on September 12, 2017. Officer Shields arrived shortly after 3:00 p.m. and saw several people in the parking lot, including Kristal, Rank, Stefen, and four people unknown to him—three ladies (Simmons, Jackie, and Ludka), and one man, Jerry. The group of four said that they were removed from the building when going through records and that they were not being allowed to reenter. Officer Shields asked others there if he could go in and get certain personal items for them, but Kristal refused. The group of four then followed Officer Shields to the police department where he gave them a blank complaint form to complete, but which was not returned. Officer Shields viewed the affair as a civil rather than criminal matter.

Simmons then called the United States Attorney's Office investigator James Flanigan (Flanigan). Simmons had worked with Flanigan when presenting documents she believed to show Colombe's ongoing embezzlement from Hunkpati Investments in 2017. Simmons expressed concerns to Flanigan about her safety and the records, and recounted what occurred. Simmons did not tell Flanigan at that time about anyone saying "this is what you get for testifying against Colombe." Flanigan opened an investigation that led to the indictment in this case.

The chairman of the board of Hunkpati Investments at the time was Wes Parsons (Parsons). Parsons in his testimony confirmed that the board had agreed to pay future electric bills for the Mel and Elnita Rank Community Center at a February of 2017 meeting attended by Rank. Parsons likewise confirmed that the board was aware that Simmons had been subpoenaed for Colombe's sentencing hearing. As of September 12, 2017, Parsons was not aware of any issue about the electric bill being unpaid and was not at the Hunkpati Investments' office when the eviction occurred. Parsons learned of the eviction later that day, went to the Mel and Elnita Rank Community Center building, and found it quiet. On September 13, 2017, Parsons paid $1,637.77 to Rank for the electric bill out of his own personal checking account. Exhs. A, B. Parsons then received Simmons's laptop and returned it to her. Hunkpati Investments' business records thereafter were available and picked up by Simmons.

Simmons testified that the Hunkpati Investments' business records she received lacked purchase orders from a couple of months of Colombe's time as the executive director. Simmons took the documents to an accountant in Chamberlain for assistance in reconstructing the financial records, but the accountant ultimately resigned as Hunkpati Investments' accountant. Hunkpati Investments then lost its certification as a CDFI and closed.

The third recorded conversation presented to the jury between Colombe and Tiffany took place on September 14, 2017. The conversation began with discussion of Colombe's relationship with her criminal defense attorney and Colombe's husband intending to divorce her. Colombe then asked Tiffany "where did Hunkpati go" and said "grandma should never have kicked them out." Tiffany's response is "well that Lahoma [Simmons] shouldn't have been disrespectful and shouldn't be going around trying to destroy you to everybody. That's why she kicked them out, is because somebody, grandma Judy or somebody called her and told her Lahoma's going around

14

saying all this stuff about you, so she got pissed off and said take me down there and wanted them out of that building." Exh. 3. Tiffany did not say that she called Rank, denied calling Rank during her testimony, and attributed this information as being second or thirdhand from what she heard at the convenience store where she worked. Tiffany then told Colombe that Rank had gotten mad upon seeing files that Simmons was making on certain family members. Tiffany's statement is inconsistent with all of the trial testimony about what Simmons and others were doing that day or where Rank was within the building. Later in the conversation, Tiffany appears to be quoting Rank about Colombe needing to "be strong she said, everything–they have to prove everything, she said" and "hold your head high and don't let them break you and be strong." Other parts of the third conversation do not relate to the events of September 12 or Hunkpati Investments.

On September 19, 2017, this Court held the sentencing hearing of Colombe. Simmons testified during the sentencing hearing. This Court imposed a sentence of 27 months incarceration of Colombe followed by three years of supervised release, together with restitution in the amount of $39,997 to Hunkpati Investments or any successor in interest including the United States Department of the Treasury (one of the funding sources).

Flanigan collected and listened to Colombe's recorded phone conversations from the Hughes County Jail. He then interviewed Tiffany at her workplace Cruzer's Pit Stop on a back patio. Tiffany acknowledged that Colombe had called her from jail and had wanted assistance with the situation involving Simmons. Tiffany stated that she did not relay the request to any others and that Colombe was just being emotional. Tiffany told Flanigan that retaliation occurs "all the time" on the reservation but said that this was not retaliation. Flanigan interviewed Kristal who said that she was asked to go to the Hunkpati Investments' office to collect a bill for Rank and that Simmons said no funds existed to pay the bill. Kristal said she returned in the afternoon

and heard Rank kicking them out and assisted in the removal. Kristal said that she may have brushed against Simmons but did not push anyone out of the office. Flanigan interviewed Rank who said that Hunkpati Investments leased the building for $750 per month which included utilities but then said there was an unpaid bill for electrical costs. Rank said that Hunkpati Investments people got confrontational and thus were evicted. Rank denied that the eviction had anything to do with Colombe, said she knew nothing about the calls between Colombe and Tiffany, and commented that Colombe deserved to do the time if she did the crime. Flanigan also interviewed Stefen. Thereafter, the six Defendants in this case were indicted.

## III.  Discussion

All six Defendants were charged with the same offense—conspiracy to retaliate against a witness. "A conspiracy ordinarily consists of two or more persons in an agreement to commit an offense plus an act in furtherance of the conspiracy." United States v. Watts, 950 F.2d 508, 512 (8th Cir. 1991). To sustain a conviction for conspiracy, "the government must prove beyond a reasonable doubt that there was an agreement to achieve some illegal purpose, that the defendant knew of the agreement, and that the defendant knowingly became a part of the conspiracy." United States v. Nelson, 165 F.3d 1180, 1184 (8th Cir. 1999) (citation omitted). "Proof of a defendant's involvement in a conspiracy may of course be demonstrated by direct or circumstantial evidence." Benton, 890 F.3d at 712 (citations omitted).

With respect to the conspiracy alleged in the indictment, Doc. 1, the elements of the offense, as set forth in the relevant jury instruction, are the following:

> *One*, that from on or about September 8, 2017 and continuing through on or about September 12, 2017 two or more people reached an agreement to commit the crime of retaliating against Lahoma Simmons for assisting law enforcement on a case involving program fraud and wire fraud;

*Two*, the defendant voluntarily and intentionally joined in that agreement, either at the time it was first reached or at some time later while it was still in effect;

*Three*, at the time the defendant joined in that agreement, he or she knew the purpose of the agreement; and

*Four*, while that agreement was in effect, a person or persons who had joined in that agreement knowingly did one or more acts for the purpose of carrying out or carrying forward that agreement.

Doc. 226, Instruction No. 6; <u>see</u> 18 U.S.C. § 1513(e) and (f). The underlying criminal purpose of the conspiracy—to commit the crime of retaliating against Lahoma Simmons for assisting law enforcement—has as its elements:

(1) a defendant knowingly caused or threatened to cause harm to Lahoma Simmons which interfered with her lawful employment and livelihood; (2) that conduct was taken with the intent to retaliate against Lahoma Simmons for providing to a law enforcement officer truthful information relating to the commission and possible commission of a federal offense.

Doc. 226, Instruction No. 7; <u>see</u> 18 U.S.C. § 1513(e). Each Defendant is entitled to separate consideration of a Rule 29 motion, just as each Defendant was entitled to separate consideration by the jury of whether the Government had proven the individual Defendant guilty beyond a reasonable doubt. <u>See</u> Instruction No. 5. This Court of course need not consider the Rule 29 motion as to Stefen, as the jury concluded that he was not guilty.

The conduct of the Defendants divides them into two groups. Colombe and Tiffany had phone conversations discussing among other things Simmons's cooperation with the United States Attorney, but Colombe and Tiffany had no interaction with Simmons on September 12, 2017, and were not at the Hunkpati Investments' office that day. Meanwhile, Rank, Kristal, and Ronda had no such phone conversations with Colombe, but interacted with Simmons at the Hunkpati Investments' office on September 12. Thus, while each Defendant is entitled to separate

consideration of a Rule 29 motion, it makes sense for this Court to discuss the evidence in two parts.

This Court in ruling on a Rule 29 motion must view the evidence in the light most favorable to the Government, resolve conflicts in the Government's favor, and accept reasonable inferences that support the verdict. Benton, 890 F.3d at 708. Viewed in this light, Colombe made a clear request during the initial phone call to Tiffany on September 8, 2017, that Tiffany needed to call "Stef or grandma and go tell them to lock up that building and don't let them have access to anything." Exh. 3. The context of the conversation made clear that "grandma" refers to Rank, that the "building" is the Hunkpati Investments' office, and the people whom Colombe wanted to prevent from having "access to anything" are Simmons and Kennedy because, as Colombe put it, those two "are putting the boots to me" and "sending Feds all kinds of stuff about me." Exh. 3. Tiffany's response was "okay," which was her response four times during the brief phone conversation. Exh. 3. Tiffany can point to the difference when she committed to call Durine Chase by saying "okay I'll call her." Exh. 3. However, the jury could make a reasonable inference that Tiffany's "okay" response was one of agreement rather than accepting Tiffany's explanation that she merely was trying to be supportive of her twin who was distraught and recently suicidal. See United States v. Boesen, 491 F.3d 852, 858 (8th Cir. 2007) (reinstating the jury's verdict by reasoning that "one possible innocent explanation for the government's evidence does not preclude a reasonable jury from rejecting the exculpatory hypothesis in favor of guilt beyond a reasonable doubt" (citations omitted)). The jury's inference of an agreement between Colombe and Tiffany is not unreasonable because Tiffany in her conversation with Colombe approximately one hour later recounted that Rank sent Ronda to Hunkpati Investments' office, but it was closed and that Rank was kicking them out of the building because of what Simmons had sent to federal officials.

Exh. 3. Tiffany during that second call said that she had called Rank, but then seemed to correct herself to suggest that someone else called Rank. Tiffany had testified to knowing that calls from the Hughes County Jail were recorded, so the jury could have made an inference—whether correctly or incorrectly is unknown to this Court—that Tiffany did call Rank but did not want the recording to be clear on the subject. This may not be the inference that the Court would draw nor sufficient evidence in this Court's view to establish guilt beyond a reasonable doubt, but a Rule 29 motion is not an opportunity for a district court to supplant a jury verdict simply because the court happens to have misgivings about whether the evidence established guilt beyond a reasonable doubt. See Boesen, 491 F.3d at 858. That is, a district court "is not to weigh the evidence or assess the credibility of witnesses" when ruling on a Rule 29 motion. Bredell, 884 F.2d at 1082. Viewing the evidence in the light most favorable to the Government, this Court sees a means by which the jury could have deemed Tiffany not to be credible in her testimony; her testimony contradicted and sought to explain away much of what she said to Colombe on the calls. The jury evidently did not believe Tiffany's testimony that she relayed to no one Colombe's request. If the jury deemed Tiffany not to be credible and made all inferences favorable to the Government from the content of the telephone calls, the jury could reasonably conclude that on September 8, 2017, Colombe and Tiffany reached an agreement to retaliate against Simmons for having assisted federal law enforcement in Colombe's case, and that Tiffany acted in a way to carry forward that agreement by encouraging Rank, either directly or through others, to evict Simmons from the Mel and Elnita Rank Community Center building for assisting law enforcement in its prosecution of Colombe.

The same elements, although different evidence, applies to the cases against Rank, Kristal, and Ronda. Although Tiffany's report to Colombe suggested there was some effort on September

8, 2017 to evict Simmons and Hunkpati Investments, the conduct of Rank, Kristal, and Ronda that matters occurred on September 12, 2017. Whatever, if anything, occurred in Fort Thompson on September 8 did not interfere with Simmons's lawful employment or livelihood; only the eviction conduct on September 12 did so. On September 12, Ronda delivered to Hunkpati Investments and in turn to Simmons an envelope containing the unpaid electric bills and made a demand for payment to occur that day. Ronda plainly was acting on behalf of Rank in delivering the bills and making the demand for payment. Ronda was not demanding payment to herself; the electric bill was owed to the owner of the building who was Rank. When Ronda returned with Kristal later in the day, both Ronda and Kristal, daughters of Rank and aunts of Colombe and Tiffany, were acting on behalf of Rank in repeatedly demanding payment. Kristal was far more aggressive in locking the office door when she and Ronda met with Simmons and standing at the door while demanding immediate payment, but Ronda was there as well and the two were acting in concert in making clear that the utility bill would have to be paid that day or eviction would occur. By that point, both knew that Hunkpati Investments did not have the financial wherewithal to pay a bill exceeding $1,600 on the spot that day.

Kristal returned with Rank to demand payment and to evict Simmons and the other employees from Hunkpati Investments' office. Again, this Court is not to assess the credibility of witnesses when ruling on a Rule 29 motion, and the jury evidently found Simmons to be credible. Simmons testified that Kristal and Rank made comments that this is what would happen if she testified against Colombe, that this was "karma" for what she was doing to Colombe, and that if you are going to testify, this is what you get. Simmons testified that Kristal repeatedly said this is karma for testifying. Stefen did not hear such comments but was in and out of the office during the time. Such comments are not on the video other than Kristal's comment about karma comes

around to which Simmons responded that yes it does but the video captures only the end of the confrontation. Jackie does not remember mention of Colombe and Ludka testified only about hearing Rank say "this is what you get for what you are doing for Tally [Colombe]." Thus, the jury could have decided this case differently, but the question on a Rule 29 motion is not whether the jury could have decided the case differently or how this Court would have judged if proof beyond a reasonable doubt existed as to each defendant.

There are other circumstances that support a reasonable inference of a conspiracy. <u>See</u> <u>United States v. Cabrera</u>, 116 F.3d 1243, 1245 (8th Cir. 1997) (stating that proof of an express agreement is not required, and that circumstantial evidence showing a "tacit understanding" between conspirators is sufficient). First, the electric bills had gone unpaid by Hunkpati Investments since February of 2017 when the board committed to pay future bills. The issue of nonpayment of the bill as grounds for eviction first arose on September 12. September 12 was four days after Colombe requested Tiffany to call Rank and have Simmons locked out of the Hunkpati Investments' office building to prevent her ongoing access to documents to give to the United States Attorney. September 12 was six days after Simmons had been served with a subpoena to testify at Colombe's sentencing hearing. Although defense counsel argued this suspicious timing to be mere coincidence, the jury could have inferred that the electric bill, although appropriately owed, was being used as a pretense to prevent Simmons from continued access to Hunkpati Investments' documents. Simmons also testified that certain purchase orders by Colombe were missing when she next had access to Hunkpati Investments' documents after the eviction. While Rank and Kristal may have been retaining the laptop and Hunkpati Investments' documents as leverage to get the electric bill paid, the jury could have inferred that there was some ulterior motive to impeded Simmons's access to Hunkpati Investments' business records that

caused the unusual circumstance of an owner evicting a tenant yet not allowing the tenant, even once the police arrived, to remove the tenant's personal property including a computer and documents.

Ultimately, a jury is to find the facts and make decisions regarding the credibility of witnesses and inferences from the evidence. That is not the role of the trial court in a jury trial. See United States v. De La Torre, 907 F.3d 581, 594 (8th Cir. 2018) ("[W]e do not review questions involving the credibility of witnesses, but leave credibility questions to the jury." (citation omitted)). The trial court is to respect the jury verdict, except when "no reasonable jury could have found the defendant guilty beyond a reasonable doubt." Hardin, 889 F.3d at 949. This Court believes that a reasonable jury certainly could have found Colombe and Tiffany not guilty and likewise found Ronda not guilty and even found Rank and Kristal not guilty. Doing so likely would have required finding Tiffany to be credible (to acquit Colombe and Tiffany), finding Simmons not to be credible (to acquit Rank, Kristal, and Ronda), and drawing different inferences from the evidence. Nevertheless, taking the evidence in the light most favorable to the Government, resolving conflicts in the Government's favor, and accepting all reasonable inferences that support the verdict, this Court cannot conclude that "no reasonable jury could have found the defendant guilty beyond a reasonable doubt." See Benton, 890 F.3d at 708; Hardin, 889 F.3d at 949. In short, this was a case that turned on credibility determinations and what inferences to draw from the evidence, and a reasonable jury could have acquitted all, some, or in this case just Stefen among the Defendants. Accordingly, this Court must deny the motions for judgment of acquittal under Rule 29.

## IV.    Conclusion

For the reasons explained in this opinion and order, it is hereby

ORDERED that the Rule 29 motions for judgment of acquittal made by Tally Colombe, Elnita Rank, Kristal Hawk, Ronda Hawk, and Tiffany Monteau are all denied.

DATED this 7th day of December, 2018.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE